136 P.3d 291

Ralph **FULLERTON** and Myra
Friedman, husband and wife,
Plaintiffs–Respondents,

v.

Henry B. **GRISWOLD** and Peggy
Griswold, husband and wife,
Defendants–Appellants.

No. 31775.

Supreme Court of Idaho,
Boise, March 2006 Term.

April 25, 2006.

Hawley Troxell Ennis & Hawley, LLP, Boise; McDevitt & Miller, Boise, for appellants. Merlyn W. Clark argued.

Speck & Aanestad, PC, Ketchum, for respondents. Douglas J. Aanestad argued.

SCHROEDER, Chief Justice.

This is an action for specific performance of an agreement for the sale of real property brought by the purchasers, Ralph Fullerton and Myra Friedman (collectively, the Fullertons), against the sellers, Henry Griswold (Griswold) and Peggy Griswold (Mrs. Griswold), (collectively, the Griswolds). The district court granted the Fullertons' motion for summary judgment and the Griswolds appealed.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Griswold is a licensed realtor who listed a condominium he owns in Sun Valley for sale with Joanne Wetherell (Wetherell), a real estate broker with RE/MAX. The listing agreement provided the price to be $1,250,000 and the brokerage fee to be 5% of the sale price. The listing agreement provided that the buyer must cooperate in a tax-deferred " § 1031" exchange. Wetherell continued to market the condominium after the listing agreement expired on October 31, 2003.

The Fullertons made an offer to purchase the condominium on April 15, 2004, for $1,200,000. Griswold rejected the offer and made a counteroffer of $1,265,000. The Full-

ertons rejected the counteroffer and submitted a second counteroffer for $1,240,000; providing that the purchase price would remain undisclosed to the multiple listing service and others, and that "upon removal of all contingencies, the Buyer agrees to release the earnest money in the amount of $50,000 to the Title Company." Griswold accepted the second counteroffer on April 20, 2004, and initialed or signed every page of the agreement. He also signed a commission statement in which he agreed to pay Wetherell a commission of $45,000, which is $17,000 less than she would have been entitled to under the expired listing agreement. The Real Estate Purchase and Sale Agreement, the second counteroffer, and all addenda are collectively referred to as "Purchase Agreement."

The Purchase Agreement included an Inspection Contingency Clause, which made the Fullertons' offer contingent upon their acceptance of the condition of the condominium. The Fullertons had a right to inspect the condominium and object to its condition by serving a written notice of their objections to the Griswolds within 14 business days from the date of "mutual acceptance," which was April 20, 2004, making the deadline May 10, 2004. The Inspection Contingency Clause provided the Fullertons could declare the Purchase Agreement null and void or could request correction of the conditions or defects on a Contingency Release form if they objected to the condition of the condominium. If the Fullertons elected to request correction of conditions or defects, the Purchase Agreement provides, "Seller shall have 3 business days to give Buyer written notice (by signing the Buyer's Contingency Release form) that Seller will correct such condition(s) and/or defect(s) prior to closing." If the Seller does not sign the Buyer's Contingency Release form, the "Buyer may, within 3 days following Seller's notice period, above, release the contingency in writing" or the "Agreement shall be null and void, in which case the Earnest Money shall be refunded to Buyer."

Fullerton executed a Contingency Release form on April 27, 2004, notifying Griswold that there were six conditions of the condo-

minium that required correction and that the Fullertons released all contingencies subject to Griswold agreeing to repair the six items. On May 3, 2004, Griswold received the signed documents from Wetherell at his Florida residence with instructions to sign and return them. A day later Wetherell spoke with Mrs. Griswold who indicated she received the documents and would make sure they were delivered to Griswold. Mrs. Griswold also said that they would be on vacation for about three weeks. Thereafter, Wetherell made several unsuccessful attempts to reach the Griswolds and informed the Fullertons that if Griswold did not return the Contingency Release form by May 6, 2004, the Fullertons had until May 11, 2004, to remove the contingency by depositing $50,000 in earnest money with the title company.

On May 7, 2004, Wetherell corresponded with the Fullertons and suggested they extend the time for Griswold to sign the Contingency Release form. She prepared a form granting Griswold additional time to sign the Fullertons' Contingency Release form. The Griswolds assert that the Fullertons signed the Addendums, which were served on Griswold, though he did not sign them, while the Fullertons contend the addenda were not sent to the Griswolds. Regardless, on May 10, 2004, the Fullertons deposited $50,000 into an account at the title company to be used for the closing.

On May 26, 2004, Wetherell spoke with the Griswolds on the phone. Wetherell told the Griswolds they would not have to make any repairs because she would pay for her repairman to do any work required of the Griswolds and would arrange for the homeowners association to take care of the work required of it. Griswold signed the Contingency Release form and made notations in the margin indicating he would address four of the conditions to be corrected and that two of the conditions were to be taken care of by the homeowners association. Also, on May 26, Wetherell informed the Griswolds that the earnest money had been deposited with Sun Valley Title Company. Mrs. Griswold asked that the earnest money be deposited into Griswold's personal interest bearing account. That same day, an escrow associate at the title company, Heather Thompson, spoke with Mrs. Griswold about placing the earnest money into such an account. On June 10, 2004, Mrs. Griswold told Ms. Thompson that Griswold intended to use Wachovia Bank to do the exchange and that she would provide the contact information.

Mrs. Griswold requested that the Griswolds be allowed to remain on the property two days beyond the possession day of July 19, 2004, even though she understood the transaction would still close on July 16, 2004. Wetherell specifically recalled Mrs. Griswold stating that she did not want the request to extend the possession date to "squelch the deal." The Fullertons stated they could not extend the possession date. On June 11, 2004, the Griswolds walked through the condominium with an employee of Sun Valley Transfer and Storage to get a cost estimate for moving their belongings. At that time Mrs. Griswold stated the packing would begin July 16 and that they would move out on July 19, 2004. Mrs. Griswold told Wetherell that the Griswolds had purchased one-way tickets to fly from Florida to Salt Lake City so they could drive to Sun Valley to pick up some of their belongings and then drive their personal car back to Florida.

In June 2004, the Griswolds met with a friend and attorney, Bob Korb. After this meeting Griswold informed Wetherell that he was not going to close the sale of the condominium due to personal reasons. Mrs. Griswold unsuccessfully attempted to cancel the escrow for the condominium on June 16, 2004. The Fullertons received a letter written by legal counsel retained by the Griswolds indicating that the Griswolds would not perform the Purchase Agreement because Griswold did not sign the Contingency Release form within three days after the Fullertons' written notice of the requested repairs. Further, Griswold did not consent to make the repairs and the Contingency Release form indicated his consent was conditioned upon his later approval, and the Purchase Agreement had become null and void by the time he signed the Contingency Release form. The Griswolds did not attend the closing and continue to intermittently occupy the condominium.

On June 21, 2004, the Fullertons filed an action against the Griswolds for specific performance of the Purchase Agreement and subsequently moved for summary judgment. The district judge granted the Fullertons' motion, finding that the payment of the earnest money was an unconditional waiver of the contingencies by the Fullertons, that Griswold intended to go forward with the sale when he signed the Contingency Release form, and that the Griswolds' subsequent conduct evidenced their intention to waive the right to claim the Purchase Agreement was void. While the Griswolds attempted to disassociate Mrs. Griswold's actions from Griswold, it is clear that the Griswolds were acting together and the district court could properly consider the conduct of each. The district judge indicated summary judgment was proper based on any one of the reasons given and awarded costs and attorney fees to the Fullertons.

The Griswolds appeal to this Court. Both parties request attorney fees on appeal.

## II.

## STANDARD OF REVIEW

Specific performance is an extraordinary remedy that can provide relief when legal remedies are inadequate. The inadequacy of remedies at law is presumed in an action for breach of a real estate purchase and sale agreement due to the perceived uniqueness of land.... The decision to grant specific performance is a matter within the district court's discretion. When making its decision the court must balance the equities between the parties to determine whether specific performance is appropriate.

*Kessler v. Tortoise Dev., Inc.,* 134 Idaho 264, 270, 1 P.3d 292, 298 (2000) (internal citations omitted). Like the district court in *Intermountain Forest Mgmt., Inc. v. Louisiana Pacific Corp.,* 136 Idaho 233, 236, 31 P.3d 921, 924 (2001), the district judge in this case was not the trier of fact during a trial but was ruling on a summary judgment motion. As noted in *Intermountain Forest Mgmt.,* the district judge, while the ultimate trier of fact, is allowed on summary judgment to arrive at the most probable inferences based upon the undisputed evidence properly before him, he does not make "findings of fact." *Intermountain Forest Mgmt.,* 136 Idaho at 236, 31 P.3d at 924. "This Court exercises free review over the entire record that was before the district judge to determine whether either side was entitled to judgment as a matter of law and reviews the inferences drawn by the district judge to determine whether the record reasonably supports those inferences." *Id.*

## III.

## THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT

The Griswolds argue the district judge erred in granting summary judgment for a number of reasons.

### A. Findings of Fact.

The Griswolds maintain that the district court erred by failing to make findings of fact. They assert that when an action is tried without a jury, while the judge is not required to draw inferences in favor of the party opposing the motion for summary judgment, the judge must make findings to identify the inferences drawn or rejected and identify the facts upon which the decision is based, relying on the Court of Appeals' decision in *Blackmon v. Zufelt,* 108 Idaho 469, 471, 700 P.2d 91, 93 (Ct.App.1985). However, in *Intermountain Forest Mgmt., Inc. v. Louisiana Pacific Corp.,* 136 Idaho 233, 31 P.3d 921 (2001), in which Idaho Forest Management, Inc. argued the district judge erred by failing to make numerous findings of undisputed fact that would have led to a grant of summary judgment in their favor, this Court rejected Idaho Forest Management's position. This Court noted that the district judge was not the trier of fact during a trial but was ruling on a summary judgment motion, drawing inferences from undisputed evidence. The question in this case is whether the record reasonably supports the inferences drawn by the district court.

### B. Credibility Issues.

The Griswolds contend that the district court improperly resolved credibility issues, when considering whether Griswold signed the Contingency Release form due to pressure from Wetherell. The Griswolds allege that they stated in their affidavits that Griswold signed the form under pressure, while the Fullertons argue that their affidavits and Wetherell's affidavit do not indicate he signed it due to pressure from Wetherell. A review of the affidavits indicates that the Griswolds' concern really dealt with the requested repairs, and not with going forward with the sale of the condominium. There is no factual record sufficient to indicate that realtor Griswold's will was overborne by pressure from Wetherell. The district court did not resolve a credibility issue. It drew an inference it deemed most probable from the facts stated.

### C. Waiver.

■ The district court based its decision in favor of the Fullertons on the basis that: (1) the payment of the earnest money was an unconditional waiver of the contingencies by the Fullertons; (2) Griswold intended to go forward with the sale when he signed the Contingency Release, and (3) the Griswolds' subsequent conduct evidenced their intent to waive their right to claim the Purchase Agreement was void.

The Griswolds argue that the deposit of the earnest money with the title company by the Fullertons does not constitute an unconditional waiver of the contingencies, asserting that there is no evidence that the parties agreed to amend the Purchase Agreement to allow the Fullertons to waive the contingencies by depositing the earnest money with the title company in lieu of executing a written release of the contingencies. They note that the Purchase Agreement includes language that if the Fullertons did not "release the contingency in writing" the Purchase Agreement is null and void. Regardless, the record is clear that the Griswolds' conduct demonstrates their intent to waive their right to claim the Purchase Agreement was void.

In *Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 846 P.2d 904 (1993), a dispute arose between the seller of a condominium in Ketchum, Margaret Wayne, and the buyer, Allan Lipsky. The buyer's agent prepared a standard form providing that the offer was made subject to acceptance of the seller on or before September 28. *Id.* Lipsky changed the acceptance date to October 2, 1987, and initialed the change before returning the form to the buyer's agent. *Id.* Wayne signed the agreement on October 12, 1987, initialed the change in acceptance date and returned the agreement to the buyer's agent. *Id.* While it is unclear whether the agent told Lipsky that the acceptance was late, he testified that it was his normal procedure to mail a copy of the agreement to the purchaser once it was accepted. *Id.* Sometime in late October, Lipsky informed the buyer's agent that he did not intend to close the purchase and that he did not have a copy of the agreement and requested one be mailed to him. *Id.* at 255–56, 846 P.2d at 906–07. For the first time on the proposed closing date, Lipsky mentioned that Wayne's acceptance was late. *Id.* at 256, 846 P.2d at 907. Wayne sued for specific performance. *Id.* When she subsequently sold the condominium, she proceeded with a claim for actual damages she alleged were caused by Lipsky's breach. *Id.* The case was tried without a jury and a judgment was entered in her favor, which was affirmed on appeal before this Court. *Id.*

■■ The district court found that Lipsky had waived his right to claim that Wayne had not timely accepted the agreement. *Id.* A waiver is "a voluntary, intentional relinquishment of a known right or advantage," and the party asserting the waiver "must show that he acted in reasonable reliance upon it and that he thereby has altered his position to his detriment." *Id.* In *Wayne Trust*, this Court focused on when Lipsky became aware that the acceptance was late, noting that although Lipsky testified he did not realize the acceptance was late until late October, the buyer's agent testified that a copy of the agreement had been mailed to Lipsky on October 12. *Id.* The Court also considered the fact that Lipsky obtained insurance and a bank loan, inquired about maintenance service, and negotiated the pur-

chase of some of the furniture in the home. *Id.* This Court held that these acts demonstrated his desire to go forward with the purchase and that the desire was communicated to Wayne through his actions. *Id.*

Griswold's affidavit indicates he was not aware that the Fullertons had failed to give written notice until after he signed the Contingency Release form. The district court considered the undisputed facts concerning the earnest money deposit, the terms of the Purchase Agreement, and the fact that Griswold signed the Contingency Release form on May 26. He signed that form after he became aware the earnest money had been deposited. Like Lipsky, Griswold had the document for several weeks before he signed it. It is even more evident he should be considered to have been aware of the noncompliance with the specific term since he actually had the form.

Similar to Lipsky, Griswold engaged in several subsequent activities that indicate he waived his right to treat the Purchase Agreement as void, including the following conduct: (1) On May 26, 2004, Wetherell informed the Griswolds that the earnest money had been deposited during a telephone conversation during which Griswold was on an extension, present, or overheard during portions of the conversation; (2) the Griswolds requested the earnest money be transferred into an interest bearing account and provided the bank account and routing numbers to Wetherell during that conversation; (3) Mrs. Griswold contacted the Sun Valley Title Company about transferring the earnest money; (4) after Griswold reread the Purchase Agreement, Mrs. Griswold informed Sun Valley Title Company that he was working with Wachovia Bank on June 10, 2004; (5) a day later, the couple did a walk-through of the condominium with an employee from a moving company and indicated the packing should begin on July 16 and the actual moving day would be July 19; (6) Mrs. Griswold requested the possession date be extended and indicated she did not want the request to "squelch the deal"; (7) Mrs. Griswold told Wetherell that they had made arrangements to travel to Sun Valley to pick up some of their belongings and drive their personal car to their Florida property. These activities support the position that it was Griswold's intention to go forward with the sale of the condominium. Like the plaintiffs in *Wayne Trust*, these acts were communicated to the Fullertons through the other party's actions, and the Fullertons relied on the apparent intent of the Griswolds to go forward with the sale. The Fullertons entered into an agreement to sell their existing Sun Valley condominium contingent upon them purchasing the condominium. They also purchased a $1700 rug fitted for the dining room in the condominium, in addition to making arrangements for moving, painting, and insurance.

The district judge is allowed on summary judgment to arrive at the most probable inferences based upon the undisputed evidence properly before him. *Intermountain Forest Mgmt.*, 136 Idaho at 236, 31 P.3d at 924. This Court reviews the inferences drawn by the district judge to determine whether the record reasonably supports those inferences. *Id.* The district court did not err when granting summary judgment to the Fullertons based on the finding that Griswold waived his right to treat the Purchase Agreement as void since the record reasonably supports the inferences drawn by the district judge.

## IV.

## ATTORNEY FEES

Paragraph 16 of the Standard Terms section of the Purchase Agreement indicates that the prevailing party is to recover reasonable costs and fees related to proceedings that are connected with the Purchase Agreement. The Fullertons are the prevailing parties. They are entitled to attorney fees and costs incurred on appeal.

## V.

## CONCLUSION

The decision of the district court is affirmed. The Fullertons are awarded costs and attorney fees on appeal.

Justices TROUT, EISMANN, BURDICK and JONES concur.